# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

No. 21-1083

### MICHAEL L. TAYLOR; PETER MAXWELL TAYLOR,

Petitioners-Appellants,

v.

### JEROME P. MCDERMOTT, Sheriff, Norfolk County, Massachusetts; JOHN GIBBONS, United States Marshal, District of Massachusetts,

Respondents-Appellees.

_____

## PETITIONERS-APPELLANTS' EMERGENCY MOTION TO STAY THEIR SURRENDER AND EXTRADITION TO JAPAN PENDING APPELLATE REVIEW

Pursuant to the Court's inherent authority and Rule 8(a)(2) of the Federal Rules of Appellate Procedure, Petitioners-Appellants Michael L. and Peter M. Taylor move this Court to stay their surrender and extradition to Japan through the balance of their appeal of the district court's January 28, 2021 denial of the Taylors' petition for a writ of habeas corpus ("Petition") challenging their extradition to Japan and their motion to amend that petition. A stay is necessary, and needed on an emergency basis, because the Government is likely to surrender the Taylors to Japan **as early as February 12, 2021**, which would moot this appeal and deprive the Taylors of any appellate review of the district court's rulings.

As detailed herein, the Taylors' extradition is unlawful because (1) if extradited to Japan, they are likely to be subjected to treatment qualifying as prohibited torture under the United Nations Convention Against Torture ("CAT"), and (2) there is not probable cause to believe the Taylors committed the offense for which extradition is sought. However, without a stay, this Court likely will be unable to review and rule upon theses issues as the United States may moot the appeal by surrendering the Taylors to Japan. The United States opposes a stay, but has represented it will not surrender the Taylors before February 12, 2021.[1]

Accordingly, the Taylors respectfully ask that the Court, **prior to February 12, 2021**, enter an Order staying their surrender or extradition to Japan pending the Taylors' exercise of their appellate rights.[2]

## I.  BACKGROUND

On May 6, 2020, the United States requested, and U.S. Magistrate Judge Donald Cabell issued, provisional warrants for the Taylors' arrest premised on the assertion that, "[o]n December 29, 2019, [the Taylors] and other individuals helped [former Nissan CEO Carlos] Ghosn flee from Japan" in violation of the conditions

---

[1] As required by Rule 8, the Taylors previously sought a stay from the district court, which was denied on February 1, 2021.

[2] Should the Court believe additional time is necessary to brief, hear argument on, and/or consider the instant motion, we respectfully request the Court at least stay the Taylors' extradition and surrender for such time as this motion remains pending.

of Ghosn's release and, according to the Government, Article 103 of the Japanese Penal Code. *See* MLT EX DE 1 ¶¶ 5, 7(a).[3] The Taylors were arrested on May 20, 2020 and they have been held in federal custody at the Norfolk County Correctional Center ever since.

On June 29, 2020, Japan filed formal requests for extradition. Following briefing and a hearing, in September 2020 Judge Cabell issued extradition certifications and ordered both Taylors held pending disposition by the Secretary of State and surrender to Japan. MLT DE 54, 56; PMT DE 51, 53.

On September 8, 2020, counsel provided the State Department with a submission opposing Japan's extradition requests. HC DE 59-5. However, after 5:00 pm on Wednesday, October 28, 2020, an Assistant Legal Advisor at the U.S. Department of State sent a one-page, two-paragraph letter to counsel for the Taylors stating that the Deputy Secretary of State had authorized the Taylors' surrender to Japan. HC DE 47-1. The next day, October 29, 2020, the Taylors filed the Petition challenging both the Deputy Secretary of State's decision and Judge Cabell's September 2020 rulings and a motion for a stay. HC DE 47 & 48. The district court granted a stay pending review of the Petition. HC DE 49.

---

[3] All docket entry citations to the record in the extradition cases (D. Mass. Case Nos. 4:20-mj-01069-DLC & 4:20-mj-01070-DLC) are identified by the relevant respondent's initials followed by "DE #"; references to the docket in the habeas corpus case (No. 4:20-cv-11272-IT) are identified as "HC DE #".

The district court held a hearing, took the matter under advisement, and maintained the stay pending its consideration of the matter. HC DE 58. Both the Government and the Taylors thereafter filed supplemental materials. HC DE 59-63 & 78. Following a December 17, 2020 disclosure by Japan regarding its investigation, a series of motions followed seeking reconsideration of the factual sufficiency of the allegations (even if Article 103 applied) as to Peter Taylor. Judge Cabell, however, ultimately denied reconsideration and, on January 28, 2021, the district court denied the Petition and a motion to amend it to seek review of Judge Cabell's reconsideration decision.

On January 29, 2021, the Taylors filed a motion with the district court requesting a stay pending appeal. HC DE 86. On February 1, 2021, the district court denied the Taylors' stay motion. HC DE 89. The Taylors now seek a stay from this Court.

## II. LEGAL STANDARD

In determining whether to grant a stay pending appeal, courts consider: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in

the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## III.    ARGUMENT

Where (as here) there is a clear threat of surrender prior to the outcome of pending review, courts in this circuit and elsewhere have granted stays in habeas cases pending appeal. *See, e.g.*, *United States v. Lui Kin-Hong*, 110 F.3d 103, 121 (1st Cir. 1997); *Romeo v. Roache*, 820 F.2d 540, 541 (1st Cir. 1987); *see also Ntakirutimana v. Reno*, 184 F.3d 419, 423 n.7 (5th Cir. 1999); *Smith v. Hood*, 121 F.3d 1322, 1327 (9th Cir. 1997); *Then v. Melendez*, 92 F.3d 851, 853 n.1 (9th Cir. 1996); *Spatola v. United States*, 925 F.2d 615, 617 (2d Cir. 1991); *Pukulski v. Hickey*, 731 F.2d 382, 383 (6th Cir. 1984); *In re Assarsson*, 670 F.2d 722, 724 n.2 (7th Cir. 1982); *Tavarez v. U.S. Attorney General*, 668 F.2d 805, 811 (5th Cir. 1982); *Artunes v. Vance*, 640 F.2d 3 (4th Cir. 1981); *Liuksila v. Turner*, No. 16-cv-00229 (APM), 2018 WL 6621339, at *1 (D.D.C. Dec. 18, 2018); *Martinez v. United States*, No. 3: 14-CV-00174, 2014 WL 4446924, at *2-6 (M.D. Tenn. Sept. 9, 2014); *Nezirovic v. Holt*, No. 7:13CV428, 2014 WL 3058571, at *2 (W.D. Va. July 7, 2014); *Zhenli Ye Gon v. Holt*, No. 7:11-cv-00575, 2014 WL 202112 at *1-2 (W.D. Va. Jan. 17, 2014); *Noriega v. Pastrana*, No. 07-CV-22816-PCH, 2008 WL 331394, at *1 (S.D. Fla. Jan. 31, 2008).

**A.    The Taylors Are Likely to Succeed on the Merits or, at the Very Least, Have Presented Serious Questions on the Merits.**

"To obtain a stay, pending appeal, a movant must establish a strong likelihood of success on the merits or, failing that, nonetheless demonstrate a substantial case on the merits provided that the harm factors militate in its favor." *Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*, 834 F. Supp. 2d 29, 30 (D. Mass. 2011) (quoting *Eon–Net, L.P. v. Flagstar Bancorp, Inc.*, 222 Fed. Appx. 970, 971–72 (Fed. Cir. 2007)). The first two factors—likelihood of success and irreparable harm—are "the most critical," *Nken*, 556 U.S. at 434, but this Court has recognized that they operate on a sliding scale such that a strong showing on one may offset a lesser showing on the other. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996) ("the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem"); *see also EEOC v. Astra USA,* 94 F.3d 738, 743–44 (1st Cir. 1996); *Maram v. Universidad Interamericana De Puerto Rico, Inc.*, 722 F.2d 953, 958 (1st Cir. 1983).

The Government argued below that the first factor was an inflexible prerequisite, claiming that the Supreme Court's opinion in *Munaf v. Geren*, 553 U.S. 674, 690 (2008), precludes reliance on any suggestion of a sliding scale. HC DE 88 at 3-4. But the Supreme Court has itself recognized that the factors "contemplate individualized judgments in each case, [and] the formula cannot be reduced to a set of rigid rules." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987). And case law before

and after *Munaf*—both within and without this Circuit—reflects that "[t]hese [four] factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *SEIU Local 1 v. Husted*, 698 F.3d 3431, 343 (6th Cir. 2012); *see also In re Aerovox, Inc.*, 281 B.R. 419, 433 (Bankr. D. Mass. 2002) ("the greater the harm the less emphasis need be placed on the likelihood of success on the merits").

Post-*Munaf*, courts within this Circuit have continued to recognize that "[c]ourts balance these factors on a 'sliding scale,' *sometimes awarding relief based on a lower likelihood of success on the merits when the potential for irreparable harm is high*." *Boston Taxi Owners Ass'n, Inc. v. City of Boston*, 180 F. Supp. 3d 108, 127 (D. Mass. 2016) (emphasis added); *see also Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*, 834 F. Supp. 2d 29, 30 (D. Mass. 2011) ("No one factor is determinative and all may be considered on a sliding scale."). As this Court itself has put it: "Simply stated, more of one excuses less of the other." *Astra USA,* 94 F.3d at 743–44.

In any event, showing a strong likelihood of success does not require an applicant to show that success is more likely than not. Though varying formulations have been employed, "[r]egardless of how one expresses the requirement, the idea is that in order to justify a stay, a petitioner must show, at a minimum, that [he] has

a substantial case for relief on the merits." *Leiva–Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011).[4]

### 1.    The Taylors' Extradition Would Violate the CAT

The Taylors' extradition to Japan is unlawful because it violates the CAT, a treaty signed and ratified by the United States and implemented by Congress as part of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARR Act"), 8 U.S.C. § 1231 note.  Under the CAT, the Government may not extradite "any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." *Id.*  In a declaration, the former Deputy Secretary of State summarily claimed to have determined the Taylors were not more likely than not to be tortured if surrendered to Japan (HC DE 60-1), but neither he nor the Government have provided any explanation regarding the basis for that determination or what was considered in making it.[5]

---

[4] Consistent with this formulation, this Court does not require a showing success is more likely than not to support bail pending appeal, but only a showing the appeal raises a substantial question of law or fact that, if determined in the defendant's favor, likely would result in reversal or a new trial. *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985).

[5] We note that the former Deputy Secretary's declaration pre-dated the November 20, 2020 issuance of Opinion No. 59/2020 discussed below.

The district court correctly held it had habeas jurisdiction to review the former Deputy Secretary's claimed determination under the CAT,[6] but it erroneously denied the Taylors relief on the stated basis the evidence presented by the Taylors "failed to establish that no reasonable factfinder could find anything other than that they are more likely than not to be subjected to torture in Japan." HC DE 81 at 28. The district court's ruling summarily discounts the Taylors' evidence as falling short of the "severe physical or mental pain or suffering" contemplated by the definition of torture, but this ruling fails to account for or address the full body of evidence in the record, which includes, *inter alia*, the following:

- Descriptions of the specific treatment of three individuals—Mr. Ghosn, Greg Kelly, and Scott McIntyre—each of whom were subjected to treatments meeting the definition of torture, including prolonged periods of solitary confinement (five weeks without a bed or, initially, a pillow for Mr. Kelly); forced to sleep shoulder-to-shoulder with other prisoners (Mr. McIntyre); denied a bed and forced to sleep on the floor (Mr. Kelly and Mr. Ghosn); deprived of heat in the dead of winter (Mr. Kelly) or provided "a low heated

---

[6] The Government argued below that the FARR Act, the REAL ID Act and/or the common law rule of non-inquiry all precluded any review of the Deputy Secretary's CAT determination, but the district court correctly rejected each of these arguments. HC DE 81 at 15-26. Citing to opinions from *Trinidad y Garcia v. Thomas*, 683 F.3d 952 (9th Cir. 2012) (en banc), the district court adopted a "rule of limited inquiry" under which a petitioner may overcome a contrary determination by the Secretary by demonstrating through "strong, credible, and specific evidence" that he is "more likely than not" to be tortured upon extradition. HC DE 81 at 26. Under the approach adopted by the district court, the petitioner must first establish a prima facie case that "no reasonable factfinder could find otherwise." If the petitioner does so, then the burden shifts to the Government to "submit evidence, should [ ]he so choose and *in camera* where appropriate, demonstrating the basis for [his] determination that torture is not more likely than not." *Id.*

room" (Mr. Ghosn); denied medical care (Mr. Kelly) or access to medications (Mr. Ghosn); denied access to any clock, calendar or other time-keeping device (Mr. Ghosn and Mr. McIntyre); subjected to lights-on conditions at all times (Mr. Ghosn and Mr. McIntyre); required to remain seated, Japanese-style, at a low table on the floor with no chairs (Mr. McIntyre); addressed only by prisoner number, and not one's name (Mr. McIntyre); interrogated constantly, day and night without breaks (Mr. Ghosn); held for up to seven hours prior to interrogation in a tiny, cold and dark cell, shoulder-to-shoulder with up to 12 other detainees while not being permitted to stand, move or talk (Mr. McIntyre); permitted to shower just twice a week (Mr. Ghosn and Mr. McIntyre); prevented from sleeping for more than an hour or two at a time (Mr. McIntyre); and given only 30 minutes (Mr. Ghosn) or 15-20 minutes (Mr. McIntrye) time outside and only on non-holiday weekdays.  HC DE 57-10, 59-17, 59-19, 61-2, 61-3, 63-2, 78-2 & 78-3.

- Opinion No. 59/2020 issued on November 20, 2020, by the Working Group on Arbitrary Detention, a body of independent human rights experts that investigates cases of arbitrary arrest and detention under mandate of the United Nations' Human Rights Council, validating Mr. Ghosn's claims, finding his detention and treatment by Japan violated numerous provisions of international law, concluding Mr. Ghosn should receive "compensation and other reparations" and, significantly, observing the practices to which Mr. Ghosn was subjected (including solitary confinement, inability to leave his cell, deprivation of exercise, constant light to disturb sleep, absence of heating, and continuous interrogation sessions lasting on average five hours) and Japan's general "interrogation and detention practices under the *daiyo kangoku* system … ***may severely limit the right to a fair trial and expose detainees to torture, ill-treatment and coercion***" and referring the case to the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment for further action.  HC DE 63-2 (emphasis added).

- A March 2020 article by three U.S. Senators describing Mr. Kelly's treatment. HC DE 59-17.

- A floor speech by U.S. Senator Roger Wicker detailing Mr. Kelly's treatment. HC DE 78-2 & 78-3.

- A statement by a former Japanese senator, Tadashi Inuzuka, confirming Mr. Ghosn's treatment.  HC DE 59-5 at 357-58.

- A letter signed by 1,010 Japanese legal professionals reporting, *inter alia*, "[i]t is not uncommon for suspects to be yelled at from close range," "[m]ost suspects" are "placed under constant police surveillance, including during

mealtimes or in toilets," identifying as "a systemic problem" the fact that "suspects who do not confess are detained for a long period of time," confirming that Japan "uses sufferings caused by prolonged detention and interrogation to force confession" and "violates international human rights standards including … the prevention of torture." HC DE 59-7.

- A 2015 Amnesty International report finding the Japanese justice system "continued to facilitate torture and other ill-treatment to extract confessions during interrogation" and "[d]espite recommendations from international bodies, no steps were taken to abolish or reform the system in line with international standards." HC DE 59-12.

The above represents only some of the evidence submitted, but it clearly describes conduct and practices by Japan rising to the level of torture. *See, e.g.*, *Guzman-Nunez v. Barr*, 822 F. App'x 563, 566 (9th Cir. 2020) (intentional denial of medical care as a form of punishment would be torture under CAT); *Kang v. Attorney Gen. of U.S.*, 611 F.3d 157, 16567 (3d Cir. 2010) (sleep deprivation, bright lights, extended periods of remaining in uncomfortable position, along with other severe mistreatment as part of interrogation is torture). At the very least this was sufficient to establish a prima facie case.

### 2. There Is Not Probable Cause to Believe the Taylors Committed the Offense for Which Extradition Is Sought Because Article 103 Does Not Apply to the Alleged Conduct

The statute Japan claims the Taylors violated—Article 103—is inapplicable, even if all the alleged facts are true. Japan's request is premised upon an unprecedented expansion of Article 103 that is articulated, if at all, by implication and inference in the applications for warrants for the Taylors' arrest. The theory appears to be that because Ghosn violated his bail conditions in departing Japan, the

11

Taylors committed the act of "enabling the escape" of a person who had committed a crime.

Japan's theory is both contrary to the plain language of Article 103 and the entirety of the history of prosecutions and accumulated case law thereunder. As Dr. William B. Cleary, a noted law professor at Hiroshima Shudo University in Hiroshima, Japan, explained, while the English translation of Article 103 "uses two verbs—'harbors or enables the escape of another'—to describe the operative conduct, the original Japanese text in fact employs a single verb—蔵匿, or '*inpi*.'" HC DE 57-6 ¶ 5. As Dr. Cleary explains, 蔵匿, or "*inpi*" comprises "a single concept that describes working against law enforcement authorities' *active* pursuit of a criminal to arrest him." *Id.* (emphasis added). But no one was actively pursuing Mr. Ghosn on December 29, 2019—there was no warrant for his arrest and the authorities were not searching for him.

As we and Dr. Cleary pointed out below, while Japanese courts have found Article 103 violations based upon assisting fugitives to evade apprehension by the police, criminals to fee the scene of a crime, and those who have escaped from confinement (*i.e.*, a jail, prison or detention facility), Japanese courts have never sanctioned (and prosecutors have never attempted) a charge under Article 103 premised solely upon an allegation that one assisted or enabled a person to violate

bail conditions. Indeed, the very use of the word "harboring" includes the assumption that someone is searching for the person being harbored.

Judge Cabell and the district court, however, both deferred completely to Japan's conclusory assertions that Article 103 applied to the alleged conduct by the Taylors. U.S. law entitles the Taylors to a determination, by a U.S. court, that there is probable cause to believe they committed the offenses for which extradition is sought. At the very least, that requires a considered analysis of whether the alleged crime is actually a crime in the foreign jurisdiction. In denying the Petition, the district court held that "[c]itizens are protected from the threat that a foreign government will simply 'argue that something is prosecutable under its laws' not by the court's opining on foreign law but by the dual criminality provisions in extradition treaties," reasoning that the fact that what the Taylors are alleged to have done in Japan would have been a crime under U.S. law if committed in the U.S. is sufficient assurance that the alleged conduct was criminal in Japan. HC DE 81 at 10. But there is no authority for this analysis, which essentially turns the dual criminality concept into a single-pronged requirement. The courts cannot merely assume something is criminal in a foreign nation just because it is criminal in the U.S. any more than they can assume something is illegal in the U.S. simply because it is prohibited abroad.

Indeed, neither the Court nor the Government dispute the crime the Taylors would have committed if they had done what they are alleged to have done in the U.S.—aiding and abetting bail jumping in violation of 18 U.S.C. §§ 2, 371, 3146, and/or 3148—actually is widely acknowledged *to not be a crime in Japan*. Indeed, Japan is forced to resort to its expansive interpretation of Article 103 precisely because of a widely-recognized gap in its own laws: Japan has no analogue to the federal bail jumping statute, nor an analogue to the federal conspiracy statute that would apply to Article 103. Ultimately, it is up to the Japanese legislature—and not a creative and embarrassed Japanese prosecutor, and certainly not the U.S. Government or courts—to repair obvious gaps under Japanese law. Japan should not be allowed to extradite and prosecute American citizens based on convenient, self-serving, and politically-motivated interpretations of its statutes that it has never applied to its own citizens.

### 3. Even if Article 103 Applied, the Factual Allegations Are Insufficient as to Peter Taylor

While the Petition was pending, Japan made a material disclosure regarding the evidence offered against Peter Taylor. Specifically, Japan and the Government's prior submissions all placed emphasis upon the assertion that, on December 28, 2019, Peter Taylor provided Mr. Ghosn with an extra key to his room at the Grand Hyatt Tokyo. According to the allegations, this enabled Mr. Ghosn, on the following day (the date of his departure), to "operate the hotel elevator and go to the ninth floor

by himself, an action that required a key to a room on the ninth floor." PMT DE 47 at 3. Japan's extradition request reasoned Mr. Ghosn must have had a key, and Peter Taylor must have provided it to him. PMT DE 47-6, Part III(7) n.8.

However, in a December 21, 2020 letter, the Tokyo District Public Prosecutors Office advised it had interviewed another employee of the hotel who stated that a room key *was not needed* to operate the elevator and enter the ninth floor on December 29, 2019. HC DE 67-1. Japan thus reported "further investigation has revealed that a room key *was not necessary* to access the Grand Hyatt's 9th floor where Peter Taylor was staying." *Id.* (emphasis added).

Peter Taylor promptly asked the district court to remand the matter to Judge Cabell for reconsideration of the probable cause issue and filed a motion seeking reconsideration. HC DE 68; PMT DE 57. In doing so, we pointed out that the provision of a key to Mr. Ghosn was the only act in which Peter Taylor himself was alleged to have engaged which enabled Mr. Ghosn to do anything he would not otherwise have been able to do on the date of his departure from Japan. Without it, the allegations were merely that he had traveled to Japan and/or met with Mr. Ghosn on several occasions over a period of months; that he checked into a hotel room in Tokyo on December 28, 2019; that he received two suitcases from Mr. Ghosn's driver; that he greeted his father and George Zayek in the lobby of his Tokyo hotel

on December 29; and that he left his hotel room at the same time as his father and Messrs. Ghosn and Zayek.

Japan acknowledges Peter Taylor went his separate way thereafter and did not accompany the group any further. Indeed, Peter Taylor departed Tokyo for China around 7:00 p.m., but it was not until roughly four hours later, and more than 600 km away, that Mr. Ghosn passed through the security checkpoint at Kansai International Airport outside of Osaka without being screened and departed on a private jet for Turkey. PMT DE 47 at 5-6; 47-6, Part III(11)-(12). There is no allegation Peter Taylor participated in, or was even present for or knew of, any of these later events.

The absence of evidence Peter Taylor himself committed an act that enabled Mr. Ghosn's alleged escape, or even any step toward it, is fatal to any probable cause determination. The Government responded by arguing Japan's subsequent investigative efforts mooted the motion, faulting Mr. Taylor for not contesting the factual allegations previously, and arguing that even without the key allegation, there was "overwhelming evidence" Peter Taylor played an "instrumental role" in "planning," "facilitating," "financing" and assisting in the execution of Mr. Ghosn's escape. HC DE 70; PMT DE 59. We sought leave to file a reply brief responding to Japan's new evidence and the Government's contentions, including a declaration from Peter Taylor denying he had given Mr. Ghosn a key, noting evidence in the

record that he was only ever given a single key (and thus would not have had one to give Mr. Ghosn), and explaining involvement in planning, facilitating, financing or assisting the alleged offense could not suffice because Japan's limited law of criminal conspiracy is inapplicable to Article 103.[7]  HC DE 71 & 75.

However, on January 15, 2021, before Peter Taylor could submit a reply brief and before the district court had ruled on the motion to stay and remand the issue to Judge Cabell (which ruling the Government itself had stated Judge Cabell should await), Judge Cabell denied reconsideration reasoning "the remainder of the evidence in the court's view, none of which moreover was disputed, still provides probable cause to believe that [Peter Taylor] assisted in the planning, financing and execution of Ghosn's escape as alleged."  HC DE 74-1

Even if correct, this finding did not suffice to establish the probable cause required with respect to Peter Taylor due to the inapplicability of conspiracy liability.  Accordingly, the Taylors sought to amend the Petition to seek review of Judge Cabell's further probable cause ruling.  HC DE 79.  The district court, however, refused to consider the merits, holding the Taylors' motion to amend was

---

[7] In 2017, Japan made it illegal for the first time to "make[ ] preparations for the purpose of committing" certain offenses or to "together with one or more persons, … plan[ ] to commit an act that constitutes" certain offenses.  However, these prohibitions on preparation and planning apply only to certain specifically-identified crimes, **of which Article 103 is not one**.  *See* Art. 6(1) & Art. 6-2(1), Act on Punishment of Organized Crimes and Control of Proceeds of Crime.

untimely.  HC DE 80.  However, the ruling of which the Taylors sought review was not issued until January 15, 2021.  HC DE 74-1.  The Taylors filed their motion nine days later.  HC DE 79.  By refusing to permit the Taylors to amend, the district court deprived them of any review of Judge Cabell's inapposite and erroneous probable cause ruling.

### B.  The Taylors Will Suffer Irreparable Harm if a Stay Is Not Granted.

The Government has not promised to wait beyond February 12, 2021 to surrender the Taylors, thus if a stay is not granted, the Taylors face surrender, prosecution and associated loss of liberty while at the same time losing ability to appeal the determination their extradition is authorized by the Treaty and otherwise lawful.  Such consequences constitute irreparable harm.  *Liuksila*, 2018 WL 6621339 at *1; *Nezirovic,* 2014 WL 3058571 at *2; *Zhenli Ye Gon*, 2014 WL 202112 at *1.

Further, if extradited, the Taylors are likely to be tortured and treated in a way that violates fundamental notions of due process, the right to a speedy trial, the right not to be subjected to lengthy and coercive interrogation in the absence of counsel, protection against cruel and unusual punishment, the presumption of innocence, the right against self-incrimination, and other rights we cherish and the U.S. and the rest of the civilized world have recognized through various international treaties and human rights conventions.  Courts have recognized the poor conditions under which

a petitioner will be held can themselves constitute irreparable harm warranting a stay. *Martinez*, 2014 WL 4446924 at *4.

## C.     The Government and Public Interest Weigh in Favor of a Stay.

The third and fourth factors—harm to the opposing party and the public interest—merge when the Government is the opposing party. *Nken*, 556 U.S. at 435. "There is a public interest in ensuring that a person is not wrongfully surrendered to face prosecution abroad." *Liuksila*, 2018 WL 6621339 at *2 (citing *Nken*, 556 U.S. at 436). Further, while the United States may have an interest in promptly fulfilling its legal obligations to its treaty partners, the United States *has no legal obligation to extradite the Taylors* under Article V of the Treaty. Here, the previous administration *chose* to extradite the Taylors, U.S. citizens, and is not under any compulsion or legal obligation to do so.[8] Where it is a U.S. citizen whose extradition is sought, "staying the extradition to allow him to seek appellate review of his claims

---

[8] The privilege to refuse extradition of one's own citizens is one Japan has not hesitated to exercise in refusing U.S. requests for extradition of Japanese nationals charged with far more serious crimes involving far more serious harm (including loss of life). Moreover, in the underlying prosecution of Messrs. Ghosn and Kelly, Japan *affirmatively worked around the Treaty* by not requesting extradition in a straight-forward fashion, but instead enlisting rival Nissan officials in a ruse to lure Mr. Kelly from his home in Tennessee to Japan under false pretenses so that it could arrest and prosecute him.

that the extradition is unlawful clearly is in the public interest." *Martinez*, 2014 WL 4446924 at *6.

However, even if the United States were obligated to extradite the Taylors, the devastating and irreparable harm of losing their appellate rights far outweighs any such obligation. Indeed, Article 3 of the Treaty expressly contemplates that extradition take place in accordance with the law of the requested party. As explained by one court:

> The court agrees that the United States' honoring of its treaty obligations is extremely important. But it does not agree that allowing an extraditee to obtain review of his legal claims interferes with the United States' ability to comply with its treaty obligations. This country prides itself on the legal process it affords those accused of crimes, even though that legal process takes time to complete.

*Martinez*, 2014 WL 4446924 at *5.

## IV. CONCLUSION

The issues raised by the Taylors are issues meriting full and careful consideration, and the stakes are enormous for them. The very least the U.S. courts owe the Taylors is a full chance to litigate these issues, including exercising their appellate rights, before they are consigned to the fate that awaits them at the hands of the Japanese government. But if a stay is not entered, there will be no review at all and this Court will lose jurisdiction. Therefore, we respectfully request that this Court enter an Order staying the extradition and surrender of Michael and Peter Taylor pending appellate review.

20

Dated:  February 5, 2021

Respectfully submitted,

*/s/ Paul V. Kelly (by permission)*
Paul V. Kelly
JACKSON LEWIS, P.C.
75 Park Plaza
Boston, MA  02110
Tel (617) 367-0025
paul.kelly@jacksonlewis.com

*/s/ Abbe David Lowell (by permission)*
Abbe D. Lowell
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
Tel. (202) 282-5875
adlowell@winston.com

*Counsel for Michael and Peter Taylor*

*/s/ Tillman J. Finley*
Tillman J. Finley
tfinley@marinofinley.com
Daniel Marino (motion for
admission forthcoming)
dmarino@marinofinley.com
MARINO FINLEY LLP
800 Connecticut Avenue, N.W.,
Suite 300
Washington, DC  20006
Tel.  202.223.8888

*Counsel for Michael L. Taylor*

James P. Ulwick (motion for
admission forthcoming)
KRAMON & GRAHAM PA
One South Street, Suite 2600

Baltimore, MD  21202
Tel. (410) 752-6030
JUlwick@kg-law.com

*Counsel for Peter M. Taylor*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.     This document complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by the Fed. R. App. P. 32(f) this document contains 5,196 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

**CERTIFICATE OF SERVICE**

I, Tillman J. Finley, certify that I electronically filed the foregoing Emergency Motion to Stay Surrender and Extradition to Japan Pending Appellate Review with the Clerk of Court using the First Circuit CM / ECF system which will send notification of filing to all counsel of record.

Dated:        February 5, 2021            */s/ Tillman J. Finley*
                                          Tillman J. Finley
                                          tfinley@marinofinley.com
                                          MARINO FINLEY LLP
                                          800 Connecticut Avenue, N.W.,
                                          Suite 300
                                          Washington, DC  20006
                                          Tel.  202.223.8888